IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHAUNNA DUMA-QUIGLEY, | CASE NO. 3:22-cv-00917 |
| Plaintiff, | DISTRICT JUDGE JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Shaunna Duma-Quigley filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter was referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

## Factual and procedural history

Although the record in this case is over 1500 pages long and the ALJ issued a 15-page decision, the issue before this Court is narrow. So a lengthy recitation of the facts is unnecessary. I confine this discussion to the facts cited by the parties that are relevant to the issue at hand—whether substantial

evidence supports the ALJ's decision to partly discount certain opinion evidence.

This case concerns the denial of Duma-Quigley's sixth application for disability insurance benefits—her previous five were denied between January 2005 and December 2012. Tr. 97. Duma-Quigley filed her current application in June 2019, alleging a disability onset date of May 9, 2019.[1] Tr. 238. Duma-Quigley's disability claim rested on several physical and mental conditions, including major depression, anxiety, migraines, fibromyalgia, and chronic pain. Tr. 312.

Duma-Quigley asserted that her condition deteriorated in September 2019, when she began experiencing "increased pain and neuropathy … worsened agoraphobia/panic attacks/anxiety/depression, which greatly affect[ed] [her] daily activities[]" and "ability to leave [her] house." Tr. 326; *see* Tr. 330–31 ("the damage to my spine, particularly my neck [has] worsened greatly"). Duma-Quigley later alleged that her condition deteriorated again in February 2020. *See* Tr. 345. Duma-Quigley reportedly "struggle[d] with … bipolar depression," in addition to anxiety and depression. Tr. 345. She reported losing "almost every job [she] … had in the last three years due to … medical reasons" and said that her part-time job was "sometimes … even too much." Tr. 350.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Relevant to Duma-Quigley's claim,[2] the record reveals that Duma-Quigley worked as a factory assembly operator from December 2016 until February 2017, a restaurant store manager from March 2017 until August 2018, a convenience store server and cashier from October 2018 until November 2018, a factory machine operator from November 2018 until May 2019, and a restaurant server from March 2019 until May 2019. Tr. 124, 314. And from January 2020 at least through the date of her hearing, she worked at a local McDonald's. *See* Tr. 42–44.

The record contains a host of medical evidence detailing the course of Duma-Quigley's medical treatment and the medications professionals have prescribed to treat her. But given the narrow issue presented in Duma-Quigley's brief, it's unnecessary to review these matters.

State agency psychologist Kristen Haskins reviewed Duma-Quigley's file in early October 2019.[3] Tr. 108–10. Dr. Haskins opined that Duma-Quigley

---

[2]    In her brief, Duma-Quigley notes that she had two hospital stays in 2019 related to suicidal ideation. Doc. 6, at 3; *see* Tr. 432, 454, 457, 524–25, 534. These visits resulted in diagnoses of major depressive disorder and recurrent, chronic major depression. Tr. 436, 438, 452, 457, 529, 539. But Duma-Quigley's argument that the agency erred does not focus on these events. *See* Doc. 6, at 7–10.

[3]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability

3

was "moderately limited" in her "ability to" (1) "interact appropriately with the general public, " (2) "accept instructions and respond appropriately to criticism from supervisors," (3) "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and (4) "respond appropriately to changes in the work setting." Tr. 109. But she opined that Duma-Quigley was not limited in her "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." Tr. 109. And in an opinion on which Duma-Quigley focuses, Dr. Haskins added that although Duma-Quigley's "ability to deal with supervisors, co-workers, and the public would be reduced[,] … she can interact with others on a *brief, infrequent, and superficial basis*." Tr. 109 (emphasis added). She concluded that Duma-Quigley "can adapt to a structured and predictable work setting with infrequent changes in responsibilities and expectations." *Id.*

The Social Security Administration (SSA) denied Duma-Quigley's application in late October 2019. Tr. 126. After Duma-Quigley sought reconsideration, Karla Delcour, Ph.D., reviewed Duma-Quigley's file in March 2020. Tr. 120–24. Dr. Delcour's assessment somewhat differed from Dr. Haskins's. Dr. Delcour opined that Duma-Quigley was not significantly limited in her ability to (1) "interact appropriately with the general public," (2) "ask simple questions or request assistance," (3) "maintain socially appropriate

---

examiner and doctor review the file and make a new determination. *See*, *e.g.*, 20 C.F.R. § 404.1615.

behavior and to adhere to basic standards of neatness and cleanliness," and (4) "carry out very short and simple instructions," but was moderately limited in her "ability to" (1) "accept instructions and respond appropriately to criticism from supervisors," (2) "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and (3) "respond appropriately to changes in the work setting." Tr. 122–23. Later in March 2020, the SSA denied Duma-Quigley application upon reconsideration. Tr. 132.

Duma-Quigley then requested a hearing before an administrative law judge (ALJ). Tr. 136. That hearing took place by telephone in February 2021. Tr. 35–80.

During Duma-Quigley's testimony before the ALJ, the follow colloquy about Duma-Quigley's employment at McDonald's took place:

> Q When was the last time that you worked?
>
> A I currently work part-time.
>
> Q Okay. And where are you working at right now?
>
> A At McDonald's.
>
> Q And you've been working at McDonald's since when?
>
> A January 26th of last year.
>
> Q And what is your hourly rate?
>
> A $10 an hour.
>
> Q And about how many hours a week are you working?
>
> A About 20 to 22 and a half.
>
> ….
>
> Q Okay. Well, I'm glad to hear that. And what are you doing at McDonald's?

A Generally, I am the Cashier. They kind of work with me and give me a position that they know is easier for me physically as well as for my anxiety. So, typically, I'm cashiering.

Q Now I know some McDonald's are still letting people come in. They may not be able to sit there, but they can do that or are you doing -- or the drive-thru? So, are you doing generally drive-thru?

A Yes. Yes. Drive-thru. We haven't opened up our lobby yet.

Q Okay. And I know -- so, that's -- I know you started there in January of last year and then pretty much everything shut down in March because of COVID. So, it's been pretty much drive-thru cashier since around March of last year?

A Yes.

Q Okay. And before that was it mostly cashier as well?

A Yeah. I said early I was a cashier at the front of the store instead of the window.

Q Okay. Okay. Now I know some stores the cashier also takes the orders. So, are you taking the orders as well?

A Yes, ma'am.

Q Okay.

A Not always, but generally.

Tr. 42–44. Duma-Quigley's counsel later followed up about her job at McDonald's:

Q Okay. Where you work at work, are there other people around?

A There are. The position that I'm in kind of keeps me away from some of the chaos of the employees. I have a little corner back there. But yes, I am surrounded by other people.

6

Q A lot of McDonald's have one window. Some McDonald's have two, the first one being where you pay it, and then the second one where you pick up.

A Yeah.

Q What kind of --

A I work at the -- we have two windows. One for pickup and one for cashiering and ordering and stuff.

Q Okay. And you work at that first window?

A Yeah, generally, at that first window. Yeah.

….

Q How long are your shifts at McDonald's?

A Six to eight hours. I do get a half hour lunch, but since I only work three days, that's why I'm working a little longer than a four or five-hour shift.

Q And are you able to make it through most of the shifts without an extra break?

A Well, we have one scheduled break that's a half an hour and generally I do have to ask for a second break.

Q Okay.

A Not as long, but I do sometimes just need to go sit down and get away from the noise from it.

Q There are references also to racing thoughts. Do you have problems with that at work?

A Sometimes I do, yeah, which again, part of the job that I'm at, at the back window, it keeps your mind pretty busy between, you know, ordering and taking money at the same time. So, it kind of helps sometimes take my mind off of things, but then other times, I get overwhelmed, and they can tell when I'm getting overwhelmed and, you know, they'll tell me to go take a minute, pull myself together, you know.

Q When you make change, do you have to calculate it or does the machine calculate and have a dispenser for it?

7

A The machine dispenses change usually, not always, but then we deal with the actual cash ourselves.

Q Okay. Do you think you could make it through an eight-hour day five days a week?

A No. I've tried. Ever since 2016 is right around when I got diagnosed with the fibromyalgia and it's the same year that I got hit by a car and ever since then, I continued for a while to try to stay in the factories and stuff like that, but every job that I had I ended up losing because of pointing out the medical reasons because I couldn't handle it. You know, so the doctor was taking me off work left and right and, you know, it caused me to lose my job. Multiple jobs. And so, I finally decided that I just couldn't -- I didn't -- once I lost my job at NASG because of being cut so much for medical, I was just like I can't do this anymore.

Tr. 61, 64–66.[4]

Duma-Quigley also explained that her managers at McDonald's had:

Definitely … made special accommodations for me, or I would not still be employed at McDonald's. They feel like I'm a good worker. They like being good to their people. So, they've been very supportive such as like I mentioned, you know, they give me a job that they know is easier for me physically and mentally. You know, if I have to miss a day because of the mental health day, or because my back hurts so bad I can't stand up straight, my job isn't at risk. They have allowed me to take medical leave when it

---

[4] The initial order that governs this case directed the parties to include in the statement of facts section of each party's brief "the facts essential to the determination of th[is] action." Doc. 3, at 4. It also explained that "[a]ny fact in the transcript not referred to in a party's *Statement of Facts* shall be deemed non-essential to the determination of the issues presented." *Id.* Duma-Quigley's *Statement of Facts* doesn't mention her testimony. *See Doc.* 3, at 3–6. But the Commissioner discusses Duma-Quigley's testimony. Doc. 7, at 8–10. So I'm recounting the aspects of Duma-Quigley's testimony that the Commissioner discusses and that are relevant to the issue Duma-Quigley has raised.

> was really bad. There have been times where my agoraphobia is so bad that I'm locked in my house for a week, you knew, and I miss work and they continually because they understand my issues, they continually work with me. It can be something as little as the fact that they let me have a stool at work or if I need to take an extra break, or again, like I said, if I have to miss a day or sometimes even a whole week, they've been really great with that.

Tr. 59–60.

Duma-Quigley also supplied an undated letter from Angel Elling, her manager at McDonald's. Tr. 388. In her letter, Elling explained that Duma-Quigley had been employed at McDonald's since January 2020, which was 13 months before Duma-Quigley's hearing. *Id*. She added that:

> We have made some special accommodations for her, due to her disabilities. For example; only scheduling her 3 days a week, allowing her to work in a position that is easier on her back and anxiety, while working, providing her with the option to take a leave for medical reasons, when necessary, and by assuring her job security despite absences due to her physical and mental health limitations.

*Id*.

When questioned about her agoraphobia and how often it caused her "a problem," Duma-Quigley said:

> Too often. I mean it's always. It's always. It's a thing that never goes away. So, even when I leave the house to go to work, I'm just – I'm scared to death for no reason, but I -- sometimes once I get busy, it goes away. But then there's other times where I can't even deal with somebody coming to my door or my phone going off even -- I mean it's -- I feel like I am just locked in here.
>
> ....

9

> And I'm scared to death to talk to anybody, to go anywhere. It doesn't make any sense why I'm so fearful, but I am.
>
> ....
>
> I mean as far as like having significant where like I am homebound, I'm having that one to two times a month. At least one.[5]

Tr. 60.

Duma-Quigley also testified that she was receiving counseling for depression and anxiety. Tr. 56. And she saw a nurse practitioner about every six weeks. Tr. 56. Additionally, Duma-Quigley's doctor changed Duma-Quigley's medications "semi-frequently." Tr. 57. She opined that her bipolar medication was her most important medication because although she "still ha[d] some moments where the depression is pretty bad, … if [she were] to not take [her] medication, it would be significantly worse." Tr. 57.

### The ALJ's Decision

After Duma-Quigley's hearing, the ALJ issued a decision in which she made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2025.
>
> 2. The claimant has not engaged in substantial gainful activity since May 9, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

---

[5]    Duma-Quigley testified that she also a "panic disorder, which is part of … agoraphobia, which kind of makes it worse." Tr. 61.

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease; fibromyalgia; and psychological conditions variously described as: opioid withdrawal, major depressive disorder, generalized anxiety disorder, agoraphobia with panic disorder, post-traumatic stress disorder (PTSD), and cannabis use disorder. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. She must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she is not off task or has to leave the vicinity of the workstation. With the bilateral upper extremities, she can occasionally reach overhead. With the bilateral lower extremities, she can frequently push and/or pull or operate foot controls. The claimant can understand, remember, and carry out simple, routine tasks but not a production rate pace such as required working on an assembly line or conveyor belt. She can make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that has relatively static work tasks and occasional changes with changes being explained in advance. She cannot perform work that requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end of day production requirements. She can have occasional interaction with the general public, supervisors and coworkers with no team or tandem tasks.

11

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 22, 1979 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 9, 2019, through the date of this decision (20 CFR 404.1520(g)).

Tr. 15–27.

## Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). The term "Disability" is defined as the "inability to engage in any substantial gainful activity[6] by reason of any medically determinable physical or mental impairment which can be expected

---

[6]    *Substantial gainful activity* is term of art defined at 20 C.F.R. § 404.1572 and assessed based on factors described at 20 C.F.R. § 404.1573 and on a claimant's earnings according to guidelines at 20 C.F.R. § 404.1574. The ALJ found that working part-time and earning $6,543 in 2020 did not amount to *substantial gainful activity*. Tr. 15. The correctness of this determination is not at issue.

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1.    Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2.    Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3.    Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4.    What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5.    Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan,* 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan,* 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence shall be conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

*The ALJ's residual functional capacity assessment is supported by substantial evidence.*

Duma-Quigley argues that "the ALJ committed reversible error when creating the residual functional capacity (RFC) for Ms. Duma-Quigley." Doc. 6, at 7. An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945); *see* Social Security Ruling 96-8p, https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Here, Duma-Quigley's quarrel is about whether she is limited to "superficial" interactions with others or "occasional" interactions. Dr. Haskins opined that although Duma-Quigley's "ability to deal with supervisors, co-workers, and the public would be reduced[,]" she could "interact with others on

a *brief, infrequent, and superficial basis*." Tr. 109 (emphasis added). The ALJ accepted nearly all aspects of Dr. Haskins's opinion but, assuming Dr. Haskins intended to convey that Duma-Quigley could interact on *no more than* a superficial basis, differed slightly as to whether Duma-Quigley would be limited to interactions only on a superficial basis. Tr. 24. The ALJ stated that her "mental residual functional capacity assessment" would "restrict[] the claimant to no team or tandem tasks with coworkers to accommodate anxiety and panic disorder, and it allows for *occasional interaction* with supervisors, coworkers, and the general public." Tr. 24 (emphasis added); *see* Tr. 123 (containing Dr. Delcour's opinion that Duma-Quigley was "not significantly limited" in her "ability to interact appropriately with the general public").

As an initial matter, it's fair to question whether Duma-Quigley has raised a question of any consequence. First, one might wonder whether there is a material difference between *superficial* interactions and *occasional* interactions. The term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). *Betz v. Comm'r of Soc. Sec.*, No. 3:21-cv-2408, 2022 WL 17717496, at *10 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, No. 3:21-cv-2408, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022); *see Beulah v. Comm'r of Soc. Sec. Admin.*, No. 1:20-cv-02271, 2022 WL 1609236, at *29 (N.D. Ohio Mar. 25, 2022) ("superficial is not a defined term"), *report and recommendation adopted sub nom. Beulah v. Kijakazi*, No. 1:20-cv-02271,

2022 WL 1606286 (N.D. Ohio May 20, 2022). And the Sixth Circuit has found meritless the argument that a limitation to *occasional* interactions was inconsistent with an opined limitation to *superficial* interactions. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Second, the ALJ included in her determination a limitation "to no team or tandem tasks with coworkers to accommodate [Duma-Quigley's] anxiety and panic disorder." Tr. 24. This "limitation on social interaction … adequately'" covers any requirement that Duma-Quigley "'be limited to superficial interaction[s] with others.'"[7] *Hines v. Comm'r of Soc. Sec.*, No. 3:20-cv-620, 2021 WL 1571659, at *3 (N.D. Ohio Apr. 22, 2021) (quoting *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020), *report and recommendation adopted*, No. 3:19-cv-1243, 2020 WL 2839654 (N.D. Ohio June 1, 2020).

Nonetheless, the ALJ perceived a distinction, even if jurists might hold that the two terms are "not inconsistent." *Reeves*, 618 F. App'x at 275. Assuming that Duma-Quigley's argument presents more than a semantic debate, the ALJ explained why she determined that "the evidence did not fully

---

[7]     Duma-Quigley disagrees, saying that a limitation to no tandem tasks doesn't account for a limitation on superficial interactions with the general public. Doc. 9, at 2. But Dr. Delcour opined that Duma-Quigley was "not significantly limited" in her "ability to interact appropriately with the general public." Tr. 123. And, in any event, a limitation to only "occasional interaction with the public" combined with "no tandem tasks" is enough to cover a "superficial-interaction-with-others" limitation. *Hines*, 2021 WL 1571659, at *3.

support that [Duma-Quigley] was limited to only" interactions on a "superficial basis with others."[8] Tr. 24. She explained that Duma-Quigley's own testimony and evidence showed that she had worked at McDonald's for over a year "as a cashier and order clerk in the drive-thru." Tr. 24. The nature of this position "require[d] more than superficial interaction with the general public." Tr. 24. And, in fact, Duma-Quigley testified that she worked as a cashier. She explained that although her "position … keeps me away from some of the chaos of the employees," she was "surrounded by other people." Tr. 61.

The ALJ further noted that Duma-Quigley offered no evidence, whether through her own testimony or Elling's letter of "problems dealing with customers, supervisors, or coworkers." Tr. 24. Review of Duma-Quigley's testimony and Elling's letter confirms the ALJ's observation. Notably, Duma-Quigley was still working at McDonalds at the time of her testimony. Tr. 24.

There's more. The ALJ also relied on Duma-Quigley's testimony "that her shifts at McDonald's were typically six to eight hours[,] … she had one regularly scheduled 30-minute lunch break and then she usually requested a second break that was shorter so she could go sit down and get away for a minute." Tr. 25. As the ALJ noted, a vocational expert testified that in an eight-

---

[8]      "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. To the extent that Duma-Quigley's challenge might be interpreted to include the argument that the ALJ failed to follow this requirement, her argument would fail. The ALJ fulfilled her responsibility to explain her decision.

hour shift, employers generally allow one 30-minute break and two 15 minutes breaks. Tr. 25; *see* Tr. 73. And Duma-Quigley did not testify that she "exceed[ed] the normal tolerance of work breaks." Tr. 25.

Little more need be said. Particularly because an ALJ has access to all the evidence, an ALJ is neither required to "adopt a state agency psychologist's opinions verbatim[] nor … to adopt the state agency psychologist's limitations wholesale." *Reeves*, 618 F. App'x at 275. Duma-Quigley's testimony—that she was "surrounded by other people," Tr. 61, and thus occasionally interacted with others at her job—provides substantial evidence to support the ALJ's determination that Duma-Quigley's RFC should include an occasional-interaction limitation.

Duma-Quigley, however, says that there is nothing "in the record that shows that her job required more than superficial interaction." Doc. 6, at 8–9. But the actual question is whether substantial evidence supports the limitation to "occasional interactions" if she is also limited to "no team or tandem tasks with coworkers." And, as discussed, it does.

Duma-Quigley also asserts that "the record contradicts the ALJ's conclusory rationale." Doc. 6, at 9. But the evidence she cites—working three days per week, ability to take medical leave, the need for breaks, and inability to work eight hours for five days—doesn't go to the question of whether she

should have been limited to superficial rather than occasional interactions.[9]
Moreover, though Duma-Quigley does not remark on it, Dr. Delcour opined
that Duma-Quigley was "*not* significantly limited" in her "ability to interact
appropriately with the general public." Tr. 123 (emphasis added). So "the
record [does not] contradict the ALJ's … rationale." Doc. 6, at 9.

Near the end of her brief, Duma-Quigley says that there is a difference
between *occasional* and *superficial* as explained in "a recent notice, dated July
27, 2022, from the Appeals Council." Doc. 6, at 9–10. Duma-Quigley says that
this notice is located at "Exhibit A, page 4." *Id*. at 10. But there is no exhibit
attached to any of Duma-Quigley's filings.

---

[9]    Duma-Quigley also references her testimony that "she had her own
'little corner' when she worked at McDonald's." Doc. 6, at 9. There are two
problems with this aspect of Duma-Quigley's argument. First, she doesn't
mention her testimony in her statement of facts. So she's not in a position to
rely on her testimony to show error. *See* Doc. 3, at 4. Second, immediately after
saying that "she had her own 'little corner,'" she explained that she was
"surrounded by other people." Tr. 61.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 28, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).